RDERED in the Southern District of Florida on _June 14, 2007_



_[signature]_

John K. Olson, Judge
United States Bankruptcy Court

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

In re:                                              :
                                                    :
**BIMINI ISLAND AIR, INC.,**                        :            **Case No. 04-26111-BKC-JKO**
                                                    :
  Alleged Debtor.                         :            **Involuntary Chapter 11**
                                                    :

### MEMORANDUM DECISION AND ORDER UPHOLDING THE STANDING OF
### PETITIONING CREDITOR GMS PARTNERS, LTD.

This involuntary case presents the issue of whether the claim of GMS Partners, Ltd. ("GMS"), a consulting firm hired by the Bimini Island Air, Inc. ("BIA or the "Alleged Debtor") on an hourly-rate basis to provide management consulting services and to install and integrate the Alleged Debtor's accounting systems, is the "subject of a bona fide dispute" within the meaning of 11 U.S.C. § 303(b)(1), such that GMS is ineligible to be a petitioning creditor. I conducted an evidentiary hearing and took argument of counsel on April 23, 2007, and the matter is now ready for decision.

The Alleged Debtor operates a charter air carrier and aircraft repair facility and retained GMS to update its operating systems. Based upon BIA's representations regarding its accounting and

inventory control systems, GMS originally estimated that the process of converting from paper-based management, accounting and inventory control systems to fully integrated computer-based systems specifically including the PowerQuote and QuickBooks software selected by BIA would require some $7,500 to $9,000 in time charges. The prior systems worked after a fashion, but the Alleged Debtor wished to have more organized, accurate and efficient systems in place. The operating and management style of the Alleged Debtor was fundamentally that of a very small business. Lines of responsibility were unclear; everyone "pitched in" to do whatever needed to be done at that moment; and management direction by the Alleged Debtor's president, Michael O'Brien, was helter-skelter. While this kind of organized chaos has a certain charm and can function in a small business, BIA's business was growing to an extent that BIA recognized that it needed systems in place if it were to sustain its growth.

Unfortunately, although it recognized the need for systems, the Alleged Debtor's management was incapable of instilling the discipline necessary to operate under the systems GMS was hired to install. Nowhere was this more clear than in the disfunctional inventory control system, where the Alleged Debtor went from a paper ticket system to what amounted to no system at all, as mechanics with access to inventory simply failed to make note of parts removed from inventory. Notwithstanding GMS's original estimate of $7,500 to $9,000 to complete its tasks, the Alleged Debtor paid some $51,655.58 to GMS for its services, and the project was never completed. At issue here is whether $11,137.50 in additional invoices are in bona fide dispute.

At trial, in addition to admitting the parties' exhibits into evidence, I heard the testimony of Eileen Game, the principal of GMS, Tim Roux, also employed by GMS, and Wally Leland, the principal of Walleland Leasing, LLC ("Walleland"), one of the other petitioning creditors, as well

2

as the testimony of Michael O'Brien, BIA's president, his wife, Andrea O'Brien, who performed, among other things, charter sales for BIA, and Irwin Adelman, BIA's in-house accountant who was hired after GMS left the job.

After receiving into the evidence the witnesses' testimony and the parties' exhibits, and after weighing the credibility of such, and in light of the agreed upon terms of the *Pre-Trial Order* [D.E. 95], I make the following findings of fact and conclusions of law:

### Findings of fact

GMS, Walleland and Maxfly Aviation commenced this case on October 7, 2004 by filing an involuntary petition against BIA seeking an order for relief under chapter 11 of the United States Bankruptcy Code (11 U.S.C. § 101 *et seq.*).

GMS joined in the petition claiming that it was owed payment stemming from its September 2002 agreement with BIA to provide BIA with management and accounting consulting services. GMS was retained on an hourly basis to convert BIA from a business that was run using paper based management, accounting and inventory systems into what was to be a more organized, accurate and efficient operation that employed the use of computers, software and better accounting and inventory control methods.

At the time that GMS was retained by BIA, the initial estimated cost of the project was between $7,500 and $9,000. Notwithstanding the initial estimate, BIA continued to pay GMS much more than that, ultimately paying $51,655.58.

It is apparent that the increased costs that BIA incurred with GMS was primarily a result of BIA's staff being either insufficiently skilled to adopt or reluctant to accept the changes being implemented by GMS, changes which GMS had been retained to make at the behest of BIA's senior

3

management. In addition, there were no clearly defined job roles established for each of the employees; often, employees attempted to do more than they could handle. BIA's in-house accountant, hired months after GMS ceased performing services for BIA, testified consistently with Game and Roux that BIA's in-house bookkeeper, Kathy Iaia, was (to put it gently) not properly suited for her primary role. All of this caused GMS to have to perform additional services, including data entry services that GMS originally contemplated would in fact be performed by BIA's employees. The cost of these additional services were not included in the initial estimate quoted by GMS in September 2002. The additional charges for data entry were *de minimis*. The charges for what were essentially management services were substantially greater.

When I asked him to describe BIA's performance in implementing the controls and other procedures being established by GMS, Mr. Roux stated that is was a problem from the top down, "the employees just didn't seem to be connected. It wasn't a common goal or a common objective to get this system implemented." BIA was aware of GMS's concern over BIA's staff. Nonetheless, by continuing to pay GMS far in excess of the initial estimate, BIA acknowledged the need for and agreed to compensate GMS for the additional work performed by GMS.

The evidence clearly revealed that at the time GMS was retained, BIA represented that its inventory system was in good order. It was not. BIA's parts inventory system was fraught with flaws, and despite repeated attempts by GMS to remedy such, BIA's maintenance personnel resisted the modernization and tighter controls that were both necessary and appropriate for BIA's inventory system. Mr. Roux testified that BIA's maintenance supervisor repeatedly resorted to the prior, albeit faulty paper based system to track its inventory, without apparent adverse consequences from BIA management. Moreover, BIA's maintenance staff refused to implement appropriate inventory

4

controls, including any limitation on the number of personnel with access to parts storage. This unfettered access to inventory prevented BIA from properly tracking its inventory, thereby preventing it from properly accounting for the costs associated with maintaining each of its aircraft.

The staffing problems testified to at trial by Ms. Game and Mr. Roux are supported by the deposition testimony of Mr. Epstein. When asked what he found when he arrived at BIA, Mr. Epstein responded, "A lack of control. A lack of accuracy. A mess." And when asked as to why he was unsuccessful in fully training BIA's staff, his response was "Talent."

GMS was constrained by BIA's directives regarding software. BIA was willing to spend a limited amount on software that was supposed to be the heart of the systems updating project. At the onset, GMS researched a number of software alternatives, but due to their respective costs, coupled with the fact that BIA already had on site two software programs, QuickBooks and PowerQuote, BIA instructed GMS to work with what was on hand, and it was contemplated that there would be an integration of these two programs. This was ultimately a disastrous decision by BIA as integration of the programs proved impossible. Gross inefficiencies stemmed from the fact that BIA's staff members had to use each software application independent of one other, resulting in a duplication of many of the bookkeeping tasks, and sometimes the entry of erroneous data when transferring such from one system to another.

Both GMS, and subsequently its replacement, Davenport Consulting, tried in vain to integrate QuickBooks and PowerQuote. During GMS's attempt at doing so, it received little or no help from the manufacturer of PowerQuote, despite its initial representations that the program could in fact be fully integrated with QuickBooks. In the end, as Mr. Adelman, BIA's in-house accountant, testified at trial, integration of the two accounting programs was never achieved despite the fact that BIA

5

spent over $100,000 with Davenport Consulting in further fruitless attempts. BIA has since abandoned its efforts to integrate the two programs.

Mr. Adelman testified that although he began working for BIA in August 2003, only a few months after GMS left the job, he had never heard of GMS until he was subpoenaed for the taking of his deposition just prior to trial and had never heard anyone complain about GMS's services. This fact is odd in light of Mr. O'Brien's testimony at trial that GMS was to blame for BIA's problems. The fact that neither Mr. O'Brien nor anyone else at BIA ever complained about GMS to BIA's in-house accountant hired shortly after GMS ceased performing services causes me to discount substantially Mr. O'Brien's attribution of blame to GMS and buttresses my conclusion that BIA's incompetent management structure and operational methods – and not GMS – was to blame for the Alleged Debtor's problems.

By mid-April 2003, GMS ceased rendering any further services to BIA. Whether it quit (as GMS contends) or was fired (as BIA contends) is irrelevant. BIA would have been entirely within its rights to fire GMS, and GMS would have been entirely within its rights to quit. But at the time of its departure, GMS was owed some amount (it contends a balance of $11,137.50) for services previously rendered.[1]

## Conclusions of law

### Jurisdiction

I have jurisdiction over the issues presented here pursuant to 28 U.S.C. §§ 1334 and

---

[1]      The involuntary petition schedules GMS's claim at $16,438.65, to which Eileen Games testified that such was purely an oversight, and at all times before and subsequent to the filing of the involuntary petition, the amount claimed by GMS as being due and owing from BIA at the time of the termination of their relationship was $11,137.50. BIA did not introduce any evidence to refute Ms. Game's testimony or the documents in support thereof.

157(b)(1). As held by the Second Circuit,[2] the existence of the requisite number[3] of creditors whose claims are not subject to bona fide dispute is subject matter jurisdictional. *In re BDC 56 LLC,* 330 F.3d 111, 118 (2d Cir. 2003). The Ninth Circuit has held, by contrast, that the requirement that a petitioning creditor's claim not be subject to a bona fide dispute is not jurisdictional but is "an element that must be established to sustain an involuntary proceeding." *In re Rubin,* 769 F.2d 611, 614-15 n.3 (9th Cir. 1985). Regardless of which approach is correct, it is clear that I have jurisdiction to determine whether I have jurisdiction. *See* 1 Collier on Bankruptcy ¶ 3.02[6][a] (15th ed. rev.).

## What is a bona fide dispute?

This case was filed prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") and is therefore governed by prior § 303. The BAPCPA amendment to § 303 modified prior law to provide that the claims at issue must not be "subject of a bona fide dispute *as to liability or amount,* " thereby characterizing "bona fide dispute" in a new way. The term "bona fide dispute" is itself nowhere defined in the Bankruptcy Code and the Eleventh Circuit has not defined the term or adopted a standard for interpretation. Some courts have adopted a summary judgment standard; that is, if there are material issues of law or fact regarding the claim, it will be considered disputed. *In re Stroop,* 51 B.R. 210 (D. Colo. 1985).[4] Other courts have adopted a multi-factored test which takes into account the debtor's subjective state of mind. *In re Johnston Hawks, Ltd.,* 49 B.R. 823 (Bankr. D. Haw. 1985). The majority of circuits,

---

[2] The Eleventh Circuit has not spoken on this issue.

[3] If there are 12 or more creditors, as the parties have agreed there are here, then there must be three eligible creditors under § 303.

[4] As discussed below, the Tenth Circuit has subsequently adopted the objective standard.

including the Second, Third, Fifth, Seventh, Eighth, and Tenth Circuits, and the Bankruptcy Appellate Panel for the Sixth Circuit,[5] have all adopted an objective standard, although the precise articulation of that standard varies somewhat. The Third Circuit held in *B.D.W. Assocs., Inc.*, 865 F.2d at 66-67, that a bona fide dispute exists "[i]f there is a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts...." The Seventh and Tenth Circuits suggest that a court must "determine whether there is an objective basis for either a factual or legal dispute as to the validity of the debt." *Bartmann*, 853 F.2d at 1544, *citing, Busick*, 831 F.2d at 750. The Second Circuit explicitly adopted the Seventh Circuit's approach. *BDC 56*, 330 F.3d 111. I conclude that the objective standard applies and accordingly apply it here.

Under the BAPCPA amendment to § 303, a dispute as to the amount of the debt claimed is apparently sufficient to render a petitioning creditor ineligible. None of the circuit or BAP cases cited above suggest that a dispute as to amount is sufficient to create a "bona fide dispute" within the meaning of the former version of § 303 applicable here. Accordingly, I conclude that under the law applicable to this case, only a bona fide dispute as to liability is sufficient to render a petitioning creditor ineligible so long as the aggregate amount claimed by the petitioning creditors is sufficient to meet the statutory minimum of $11,625 applicable to this 2004-filed case. Since the parties have agreed that petitioning creditor Walleland Aircraft Leasing, LLC, holds a claim not subject to a bona fide dispute, and I have already ruled in this case that another petitioning creditor, Maxfly Aviation,

---

[5] *In re BDC 56 LLC*, 330 F.3d 111 (2d Cir. 2003); *B.D.W. Assocs., Inc. v. Busy Beaver Bldg. Ctrs., Inc.*, 865 F.2d 65 (3d Cir. 1989); *In re Sims*, 994 F.2d 210 (5th Cir. 1993); *In re Busick*, 831 F.2d 745 (7th Cir. 1987); *In re Rimell*, 946 F.2d 1363 (8th Cir. 1991); *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540 (10th cir. 1988); *In re Eastown Auto Co.*, 215 B.R. 960 (6th Cir. BAP 1998).

holds such a claim, and since the Walleland and Maxfly claims together exceed the $11,625 threshold, the only issue here is whether GMS's claim is subject to bona fide dispute. In other words, if GMS holds a claim in any amount which is not subject to dispute as to liability, then there are three petitioning creditors who satisfy the requirements of § 303.

The burden of proof is on the petitioning creditors to establish a *prima facie* case that there is no bona fide dispute as to liability. *In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057 (9th Cir. 2002); *In re Reid*, 773 F.2d 945 (7th Cir. 1985). Once the creditor satisfies its burden, the burden shifts to the debtor to demonstrate that a bona fide dispute exists as to liability. *BDC 56*, 330 F.3d 111; *Sims*, 994 F.2d 210.

BIA contends that the issue of liability is genuinely in dispute. Based on the evidence presented, I cannot agree. The evidence is overwhelming that GMS inherited a problem much larger than it was led to believe when it was retained by BIA; that GMS brought appropriate staff to deal with the problem; and that until GMS quit (or was terminated), it was appropriately performing under its contract with the Alleged Debtor. Some balance is due GMS under that contract.

BIA represented that it had a good inventory system in place prior to GMS's arrival. This was clearly not true. Mr. Roux testified that, after GMS was retained, he was required to devote a substantial amount of time repeating previous work because of the reluctance, inability or flat out refusal of BIA's maintenance personnel to adopt the changes that GMS was hired to implement with respect to BIA's inventory control system. This carried over into other areas of BIA's operations that GMS assisted with. Notwithstanding these representations, GMS continued to work for and BIA continued to pay GMS without objection.

BIA's bookkeeper on staff when GMS arrived, Kathy Iaia, as acknowledged by BIA's in-

9

house accountant Irv Adelman, was difficult to work with and was not sufficiently skilled to perform

her primary tasks. BIA was run on an *ad hoc*, helter-skelter basis without any organizational controls

or discipline. Management did not know what was going on in its own company and did not provide

the necessary preconditions for the implementation by GMS of the systems it was hired to install.

BIA acknowledged by its own actions in paying – without objection – some five to seven times

GMS's original cost estimate that the project GMS undertook was monumental. No challenge to

GMS's services or billings were made until after GMS left the job.

In the end, BIA simply refused to pay for the additional services which were required by its

operational deficiencies and which it requested GMS to perform. This refusal cannot be considered

that which gives rise to a bona fide dispute. For the foregoing reasons, this Court finds that GMS is

the holder of a claim that is not subject to a bona fide dispute as to liability. Because I am not

required to determine the amount of GMS's claim, other than my determination that there is a

balance due GMS, I do not do so at this time.

### Remaining issues

In light of my determination that GMS is eligible to be a petitioning creditor under § 303,

there are now three petitioning creditors in this case whose claims are not subject to bona fide

dispute, and any issue as to whether additional petitioning creditor Aerospace Electronic, Inc. has

standing to be a petitioning creditor is moot. Accordingly, the one remaining issue to be decided

in connection with the involuntary petition is whether BIA, as of the petition date, was generally

paying its undisputed debts as they came due, as required by 11 U.S.C. § 303(h). Therefore, the

Court will conduct a status conference in Courtroom 308, United States Courthouse, 299 E. Broward

Blvd., Ft. Lauderdale, FL 33301 on June 25, 2007, at 10:30 a.m. to set a date and time for trial on

that issue.

###

Copies furnished to:

Jason E. Slatkin, Esq., counsel for Petitioning Creditors
Chad P. Pugatch, Esq. and Craig A. Pugatch, counsel for the alleged debtor
Office of the United States Trustee

I:\ORDERS\04-26111 Bimini-GMS claim.wpd